# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

EDWARD RICHARDSON,                          )
                                            )
      Plaintiff,                             )
                                            )
      v.                                     )     CAUSE NO.: 3:06-CV-446-TS
                                            )
CHAD BARR, HOSPITAL                         )
ADMINISTRATOR, PRISON HEALTH                )
SYSTEMS AT MIAMI CORRECTIONAL               )
FACILITY, in his individual capacity;       )
TONY HOBBS, DIRECTOR OF                     )
NURSING MIAMI CORRECTIONAL                  )
FACILITY, in his individual capacity;       )
CINDY WILLIAMS, NURSING                     )
SUPERVISOR MIAMI CORRECTIONAL               )
FACILITY, in her individual capacity;       )
LYNN FRY, NURSING SUPERVISOR                )
MIAMI CORRECTIONAL FACILITY,                )
in her individual capacity; SALLY           )
STEVENSON, VICE PRESIDENT                   )
HEALTH SERVICES MIAMI                       )
CORRECTIONAL FACILITY, in her               )
individual capacity; NICHOLE PAX,           )
SECRETARY, PRISON HEALTH                    )
SYSTEMS MIAMI CORRECTIONAL                  )
FACILITY, in her individual capacity;       )
OFFICER TULEY, MIAMI                        )
CORRECTIONAL FACILITY, in her               )
individual capacity; and DR. EKE KALU       )
PRISON HEALTH SYSTEMS DIRECTOR,)
INDIANA DEPARTMENT OF                       )
CORRECTION, in his individual capacity,     )
                                            )
      Defendants.                            )

# OPINION AND ORDER

The Plaintiff, Edward Richardson, is pursuing an Eighth Amendment claim under 42

U.S.C. § 1983. The Defendants are officials and staff at the Miami Correctional Facility where

the Plaintiff was an inmate. The Plaintiff alleges that, over the course of fifteen months, the

Defendants were deliberately indifferent to the serious medical needs that he developed from a head injury. Defendants Chad Barr, Tony Hobbs, Lynn Frye, and Cindy Wilson have moved for summary judgment (DE 46), and Defendant Nicole Pax joined in their motion (DE 50), but has since been dismissed (DE 65) by stipulation of the parties. The Plaintiff opposes the Defendants' motion. Defendants Sally Stevenson and Officer Janet Tuley filed a separate motion for summary judgment (DE 59), which the Plaintiff has not responded to.

## BACKGROUND

On July 18, 2006, the Plaintiff filed this § 1983 suit against eight officials and staff members of the Miami Correctional Facility (MCF) alleging that they were indifferent to his serious medical needs. On August 16, Defendants Barr, Hobbs, Williams, Fry, and Pax answered the complaint. On October 10, Defendants Tuley and Stevenson filed an answer. There is no record of service for Defendant Dr. Eke Kalu.

On April 30, 2007, Defendants Barr, Hobbs, Williams, and Fry moved for summary judgment. Defendant Pax joined in the motion. On August 31, the Plaintiff responded to the Defendants' motion for summary judgment. On September 4, Defendant Tuley and Stevenson filed a motion for summary judgment. Defendants Barr, Hobbs, Williams, and Fry replied on September 6, and Defendant Barr filed an additional reply on September 12. By stipulation of the parties, Defendant Pax was dismissed from the suit on October 4.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. If there is no genuine issue of material fact, the only question is whether the moving party is entitled to judgment as a matter of law. *Miranda v. Wis. Power & Light Co.*, 91

F.3d 1011, 1014 (7th Cir. 1996).

Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). The court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## STATEMENT OF MATERIAL FACTS

### A.    Injury and Treatment History[1]

The Plaintiff was an inmate MCF when, on July 17, 2004, another inmate hit the Plaintiff in the head. He was found lying on the floor with blood coming from his left ear. The Plaintiff was taken to the MCF clinic and examined. An ambulance took him to Dukes Memorial Hospital in Peru, Indiana, where he was air-lifted to Wishard Memorial Hospital in Indianapolis for a neurosurgery evaluation.

---

[1] The Plaintiff's treatment history as an inmate spans almost two years, from July 17, 2004, to May 12, 2006. Although the majority of this treatment is not alleged by the Plaintiff to be defective, the Court includes it here, in part, because deliberate indifference claims are to be viewed in the totality of care administered. *See Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997). The Court also includes it because, although the claims the Plaintiff pursues in response to the Defendants' motions for summary judgment cover a shorter time frame and a narrower subject, his Complaint allegations are broad.

While at Wishard, the Plaintiff received several head CT scans and was diagnosed with a subarachnoid hemorrhage, subdural hematoma, and temporal bone fracture. The Plaintiff also received a physical therapy consultation and speech pathology evaluation, treatment for a right frontal contusion, and a neurosurgery consultation.

On July 22, 2004, the Plaintiff was released from Wishard. He was instructed to see a doctor in the neurosurgery clinic in three weeks for a follow-up of his contusion. The Plaintiff was provided with pain medication and told to notify the prison medical staff if he experienced headaches, nausea, vomiting, visual change, or a change in level of consciousness. Upon his return to MCF, the Plaintiff was taken to the infirmary. On July 26, Dr. Myers released the Plaintiff to the general population. The Plaintiff had no complaints of dizziness or nausea and his ears were negative for active bleeding. He did complain of headaches.

On July 29, MCF staff saw the Plaintiff and gave him Midrin for his headaches and an injection of Nubain and Phenergan for pain and nausea. The staff provided the Plaintiff with cotton balls that he was to keep in his cell for ear drainage and to place in his ears before a shower to avoid infection.

On August 6, MCF staff saw the Plaintiff for sever headaches. He was seen again in the jail's sick call on August 12, but was sent back to the dorm without seeing a doctor. He was scheduled to see a doctor on August 13 and 16, but did not receive a pass.[2] On August 17, the Plaintiff complained that his ear was bleeding and that he was having dizzy spells. He was able

---

[2] The Plaintiff does not define the pass referenced in his statement of facts. Neither party describes the sick call or "pass" procedures used at MCF. Although this information may be included in evidentiary materials that were submitted to the Court, they are nowhere described in the parties' briefs with reference to designated portions of the record. There is no information regarding who is responsible for issuing passes in general or who did not issue passes on these particular dates.

to see Dr. Eggers, but only after he refused to leave when the nurses tried to cancel his appointment. The Plaintiff told the medical staff that his "medicine had expired." (Pl. Resp. DE 58 at 3.)[3]

On August 23, the Plaintiff noted in a written log, which he was keeping to record his medical care, that he was out of medication. He was escorted to the medical facility, where Dr. Myers ordered new medications. The Plaintiff complained of headaches and severe vertigo. Dr. Myers noted that the Plaintiff's neurosurgery follow-up appointment was already scheduled and that they would proceed with that appointment.

On August 26, Dr. Myers stopped using Midrin to treat the Plaintiff's headaches because the drug was no longer available from the manufacturer. The doctor ordered a generic equivalent of Midrin for the Plaintiff. The Plaintiff's log indicates that he received no pain medication or amoxicillin on August 29, 30, 31, or on September 1 and 2, 2004.

On August 31, Dr. Myers examined the Plaintiff, noting his steady gait and a little swelling in the left ear. Dr. Myers's notes indicate that the Plaintiff's tympanic membrane (TM), or inner eardrum, appeared unchanged. The Plaintiff complained of traumatic headaches, vertigo, and insomnia. Dr. Myers prescribed Prednisone and ibuprofen and told the Plaintiff to follow up in two weeks. The Plaintiff reported to the doctor that he did not receive medication, and Dr. Myers ordered more medication for the Plaintiff. (As noted above, the Plaintiff went two more days without medication.)

On September 12, Dr. Myers saw the Plaintiff and instructed him to keep taking medication for his headaches. On September 13, the Plaintiff submitted a prison form to request

---

[3] The Plaintiff does not indicate whether this meant he was out of medicine or that the medicine he had was past its expiration date.

health care because he had an ear infection and did not receive amoxicillin. He completed the form again on September 19, complaining that he had been told he would see a doctor on the 15th, but still had not seen him. On September 26, the medical staff told the Plaintiff that it was out of Antivert. The Plaintiff received more Antivert on October 2. On September 27, Dr. Myers again saw the Plaintiff, who complained of vertigo. Dr. Myers ordered lab test on drainage from the Plaintiff's ear and also ordered an ear, nose, and throat (ENT) consult.

On October 12, the Plaintiff notified his dorm officer that his left ear was leaking and that Dr. Myers wanted to see him right away if his ear was draining. The nursing staff told the Plaintiff that he had to complete a health care slip. The next day, on October 13, the Plaintiff went to Wishard for a neurosurgical evaluation. The medical staff instructed him to follow up with the ENT for evaluation and a left TM rupture, and then return to the neurosurgery clinic.

On October 15, the Plaintiff's face was swollen. Dr. Myers responded on October 18 by ordering an antibiotic for the Plaintiff's increased pain and swelling on the left side of his face, sinusitis, and ear leakage. The Plaintiff received a pass from Dr. Myers but was told at the hospital to return to the dorm, and that he could not see the doctor until the next day. The following day, the nursing staff told Officer Tuley not to allow the Plaintiff into the hospital. Officer Tuley worked at the control desk in the Offender Services Building, where the medical department is housed. Officer Tuley is not involved in the scheduling of medical appointments.

The Plaintiff was scheduled for sick call on October 20, but all sick calls on that date were cancelled. No doctors were available on October 21 or 22.

On October 23, the Plaintiff complained of dizzy spells and blurred vision. Dr. Myers told the Plaintiff to wait for his ENT appointment and follow-up, which was four weeks away.

7

On October 25, Dr. Myers saw the Plaintiff and ordered a triple antibiotic.

On November 2, the Plaintiff complained of headaches, dizziness, and lapses of memory. Dr. Myer prescribed and reordered triple antibiotic because the Plaintiff did not receive the earlier-ordered antibiotic, and he continued pain medication. (The date the Plaintiff received the antibiotic is not in the record.) On November 28, the hospital ran out of the Plaintiff's antibiotics until November 30, when he again received antibiotics.

On December 1, the night nurse called the prison dorm and stated that the Plaintiff was not to be released to the medical facility for "as needed" treatment reasons.

On December 3, the Plaintiff went to Wishard for a ENT evaluation. The ENT doctor noted the Plaintiff's initial diagnosis of a left temporal bone fracture, subdural hematoma, and brain contusion, but that he did not need surgical intervention at the time of his injury. The doctor stated that the TM in his left ear was perforated and clear liquid was coming from the ear. The Plaintiff was diagnosed with cerebral spinal fluid (CSF) leak due to temporal bone fracture. The Plaintiff was told to elevate his head and continue medications and that the ENT would talk about possible surgical repair with the otology team. He was also told that, in four days, he should tell the nurses at MCF how he was doing. When the Plaintiff returned to MCF, he met with Dr. Myers. Dr. Myers ordered new medications and wrote in his notes that the Plaintiff was "understandably miffed" because he was "caught in the middle of [a] custody-medical pissing match."

On December 4 and 5, the Plaintiff logged that the nurses refused him treatment. On December 8, Dr. Myers again wrote a new order for medications. Someone on the nursing staff misplaced the order. On December 9, the nursing staff did not give the Plaintiff his medication

because they could not find Dr. Myers's orders. On December 10, he was refused antibiotics, but when he talked to the supervisor, she discovered the medication that had been there for two days.

On December 21, the side of the Plaintiff's face and his nose became swollen, and he was taken to the nursing station, where antibiotics were ordered. On December 22, the nursing staff told the Plaintiff that he had to take his antibiotics at 5:00 AM. This time was not ordered by Dr. Myers. When the Plaintiff came to get his antibiotic at 9:00 AM, on December 23, he did not receive them. On December 24, the Plaintiff saw that he was marked as having taken medication at 5:00 AM, but he had not taken it.

On December 25, the Plaintiff found out that the prison had run out of Midrin.[4] From December 26 to 29, the Plaintiff was not given any Midrin and only one antibiotic per day. He received two antibiotics on December 30. On December 31, the Plaintiff received one antibiotic and was told that Midrin was available, but he could only get it at night. The Plaintiff received one antibiotic per day from January 1 through 5, 2005.

On January 5, 2005, the Plaintiff's ear leakage was no longer clear; it was green. The Plaintiff stated that he did not have fever, pain, dizziness, or hearing impairment. On January 7, a sample of the green drainage was taken for lab testing, and the Plaintiff was given an ice pack for headaches, Neosporin for his nostrils, Tylenol, and cotton balls. On January 21, the Plaintiff was informed that the lab report indicated that he had an MRSA infection.[5]

---

[4] The Plaintiff's written log is the designated evidence in support of this statement. Previously, the Plaintiff was discontinued on Midrin because it was not available from the manufacturer. The parties do not indicate in their briefs when Midrin became available again.

[5] MRSA (Methicillin-resistant *staphylococcus aureus*) is an infection with a strain of *Staphyloccus aureus* bacteria that is resistant to standard antibiotics known as beta-lactams, including methicillin, amoxicillin, and penicillin. http://www.nlm.nih.gov/medlineplus/ency/article/007261.htm (visited on Feb. 15, 2008).

On January 24, the Plaintiff did not have any drainage from his ear. However, he noted that his headaches had doubled in frequency and intensity. Dr. Myers noted that the drainage had decreased and instructed the Plaintiff to see him for a follow-up in three to four weeks. On January 27, the Plaintiff went to Wishard for a CT scan of the temporal bones. The scan showed multiple soft tissue linear densities within the middle ear cavity consistent with chronic middle ear inflammation or infection. The left TM was perforated and the ear contained a small amount of fluid.

On February 10, Dr. Myers referred the Plaintiff to neurosurgery, noting that he was having increased headaches but no further drainage. On February 14, the Plaintiff denied having drainage and Dr. Myers told him to wait until his neurosurgery appointment. On February 17, the Plaintiff reported to the nurses that his headaches had decreased in severity. Dr. Myers noted that the TM was still red, but that there was no drainage and the CSF leak was resolved. On February 21, Dr. Myers noted that the Plaintiff continued to do well and had no drainage. The Plaintiff reported daily episodes of temporal pain, but his headaches were mostly gone.

On February 25, the Plaintiff went to Wishard for a neurosurgery follow-up appointment for his CSF leak. The doctor noted that the Plaintiff's daily headaches had resolved, that he was two weeks without drainage, and that he had no meningitis. The doctor recommended another CT scan to see if surgery was appropriate because the CSF leak was still there.

On March 2, the Plaintiff went to another follow-up at Wishard neurosurgery. The doctor noted no ear leakage for thirty days, no leaking from the ear or nose when the Plaintiff's head was down for one minute, and some sinus fluid in the temporal bone. The neurologist recommended a CT scan to evaluate the leak. The Plaintiff stated that his headaches improved

with Midrin and dizziness improved with Antivert. The neurologist stated that the CSF leak had clinically resolved.

On March 21, the Plaintiff reported that he had chunks of drainage since the leakage had stopped, but that cotton balls helped. Dr. Myers noted that the TM perforation was a little smaller. On March 28, Dr. Myers gave the Plaintiff ibuprofen and allowed him to increase physical activity, noting again that the TM perforation was smaller. On April 2, Dr. Myers again noted that the TM perforation was smaller. The Plaintiff reported a little bit of drainage. On April 14, Dr. Myers noted that the leakage had recurred and prescribed an antibiotic. He noted that the TM perforation continued to decrease.

On April 22, the Plaintiff received a CT scan, which showed a reduction of edema and increase in CSF spaces. On April 24, Dr. Myers saw the Plaintiff and noted that he continued to do well, and that the CSF leak had resolved. On April 25, the nurse noted no further drainage, no headaches, and that the Plaintiff's dizziness had abated. In his May 6 progress notes, Dr. Myers stated that the Plaintiff was doing well with no drainage. On May 27, Dr. Myers noted that the TM perforation was not enlarged, looked like it did three weeks ago, and that it would probably not close completely. He told the Plaintiff to follow up in four weeks.

On July 21, the Plaintiff reported severe dizziness, but denied any nausea or headaches. The nurse noted no drainage and good balance. The Plaintiff was put on sick call and told to move around slowly and report back if he noticed any drainage. The next day, the Plaintiff again complained of increased dizziness. Dr. Myers noted a hold in the middle left TM and assessed him with chronic dizziness. Dr. Myers authorized a special pillow for the Plaintiff and planned to follow up with ENT.

On August 12, the Plaintiff returned to Wishard for his ENT follow-up. He was diagnosed with left TM perforation. The doctor decided to patch the hole, and on September 22, the Plaintiff's TM perforation was surgically closed. On September 23, his TM was checked and he was told to follow up with the surgeon in four weeks.

On October 28, the Plaintiff went to Wishard for his post-surgical evaluation. The doctor noted no change in hearing, no medications needed, no complaints of dizziness, no cotton balls or water precautions necessary, and no activity or work restrictions.

On December 16, Dr. Myers's progress noted indicate that the Plaintiff's headaches and dizziness increased after his post-operative therapy for balance problems. He noted that the TM continued to look good.

On February 10, 2006, the Plaintiff went to Wishard for a follow-up exam. He complained of very mild hearing loss. An examination showed his TM intact with no infection. The Plaintiff was scheduled to return in a month for a test to determine if his eardrum was working.

At his follow-up, on May 12, the test showed that the eardrum was doing well. The Plaintiff was to return for another audiology evaluation in two to three months, to be weaned from Antivert, and to continue rehabilitation.

In August 2006 the Plaintiff was released from prison.


**B.      Miami Correctional Facility Procedures**

When an inmate needs to be evaluated at Wishard, scheduling assistant Nicole Pax must first receive a consultation request from the treating physician. The consultation request is

forwarded to the corporate office for approval. When Pax receives approval, she calls Wishard to inform them of the need for an evaluation. Wishard then schedules the visit with Pax. Non-emergency situations generally take several weeks to months to schedule at Wishard, depending on the hospital's schedule.

Sally Stevenson is the Assistant Superintendent of Programs. She is not responsible for scheduling medical appointments or referring inmates to outside hospitals or clinics.

**C.      Letters to Staff**

On December 26, 2004, the Plaintiff wrote to Tony Hobbs, the Director of Nursing, asking for a meeting to discuss his problems with the medical staff. On February 2, 2005, Stevenson, responded to the Plaintiff, stating that it appeared he was receiving medical care and that efforts were being made to deal with his issues.

**DISCUSSION**

The Plaintiff asserts that the Defendants violated his rights under the Eighth Amendment. A violation of the Eighth Amendment's cruel and unusual punishments clause consists of two elements: (1) objectively, whether the injury is sufficiently serious to deprive the prisoner of the minimal civilized measure of life's necessities, and (2) subjectively, whether the prison official's actual state of mind was one of "deliberate indifference" to the deprivation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In the context of medical care cases, the test is whether the defendant was deliberately indifferent to the serious medical needs of a prisoner. *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).

To satisfy the objective component, a prisoner must demonstrate that his medical condition is "objectively, sufficiently serious." *Farmer*, 511 U.S. at 834 (internal quotations omitted). A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. *See Foelker v. Outagamie County*, 394 F.3d 510, 512–13 (7th Cir. 2005).

To satisfy the subjective component, a prisoner must demonstrate that prison officials acted with a "'sufficiently culpable state of mind.'" *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.,* the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quotation marks, brackets, and citation omitted). "Negligence on the part of an official does not violate the Constitution, and it is not enough that he or she should have known of a risk. Instead, deliberate indifference requires evidence that an official actually knew of a substantial risk of serious harm and consciously disregarded it nonetheless." *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004) (citations omitted). Deliberate indifference is "something approaching a total unconcern for [the plaintiff's] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). This total disregard for a prisoner's safety is the "functional equivalent of wanting harm to come to the prisoner." *McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir. 1991). It is not enough to show that a defendant merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). Even medical malpractice and incompetence do not state a claim of deliberate indifference. *Walker v. Peters*, 233 F.3d 494

(7th Cir. 2000).

The Defendants do not dispute that the Plaintiff suffered serious injuries following the attack by another inmate on July 17, 2004. They argue that the Plaintiff's claim fails under the second prong of the *Farmer* test because they did not act with the requisite culpable state of mind. The Defendants state:

> As shown in the statement of facts above, [the Plaintiff's] injuries were monitored closely with routine exams, medications, and outside evaluations. [The Plaintiff] was given every necessary evaluation, including twelve visits to Wishard neurosurgery and a Wishard ENT specialist. [The Plaintiff] was seen at least thirty-eight times by medical staff at MCF, including a four-day stay in the MCF infirmary following his return from Whishard Hospital after his attack. [He] was kept on medications for pain, dizziness, and headaches. He was given cotton balls to prevent water from getting into his ears for the purpose of preventing infection. All reasonable and appropriate care was given to [the Plaintiff] while it was determined whether surgical repair of his TM perforation was necessary and while surgery was scheduled.

(Defs.' Mem., DE 47 at 11.) The Defendants also argue that they are entitled to qualified immunity because they held reasonable beliefs that their actions were lawful.

In the Plaintiff's response to the Defendants' arguments, he pinpoints the irregular receipt of medication for his dizziness, vertigo, and pain. (Pl.'s Resp. DE 58 at 8) (stating that after conducting discovery the delay in obtaining an operation to close the perforation in his ear is not the "main matter of contention"). He argues that the irregular distribution of antibiotics by the medical staff could have been a factor in the nose and MRSA infections that he developed. (*Id.*) The Plaintiff argues that there is enough evidence in the record that a jury could decide whether the medical staff, under the direction of the prison and health officials, acted with deliberate indifference. (*Id.*)

15

**A.     Delay in Receiving Medication**

The evidence does not create a genuine issue of fact regarding whether the Defendants acted with a sufficiently culpable state of mind. The Plaintiff does not refute the Defendants' evidence that his sometimes sporadic receipt of medication and antibiotics was due to staff members' mistakes or to factors outside the prison's control. He does not present evidence that they intentionally withheld medication when it was available. It cannot be concluded, on the record before this Court, that the Defendants consciously disregard the Plaintiff's medical condition.

**1.     *Midrin***

The Plaintiff was initially prescribed Midrin for his headaches. On August 26, Dr. Myers discontinued Midrin because it was no longer available from the drug manufacturer. Dr. Myers then ordered a generic drug to replace the Midrin. The Plaintiff was without medication for his headaches for a span of seven days from August 28 to September 3, 2004. Later, from December 26 to 30, the Plaintiff was again without Midrin.

There is no evidence that a non-prisoner wishing to take Midrin would have been in any better position than the Plaintiff in September 2004. The Defendants were not responsible for the unavailability of the Plaintiff's preferred headache medicine from the manufacturer. The Plaintiff does not attempt to identify how any staff member caused the delay in receiving the alternative medicine ordered by Dr. Myers. And when the Plaintiff reported on August 31 that he had not received new medication,  Dr. Myers again ordered more medications. For the five-day span in December, the Plaintiff indicates only that the prison ran out of Midrin. Nothing suggests that

16

the medical staff intentionally mismanaged its supply of Midrin. Although the reason for the shortage of Midrin is not developed in the record, the most that can be inferred is that the staff was negligent in stocking the drug.

"A negligent or inadvertent failure to provide adequate medical care is insufficient to state a section 1983 claim because such a failure is not an 'unnecessary and wanton infliction of pain,' and is not 'repugnant to the conscience of mankind.'" *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (quoting *Estelle*, 429 U.S. at 105–06). Even conduct rising to the level of medical malpractice "does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. The Plaintiff has not presented evidence from which a jury could conclude that the Defendants ignored a substantial risk of harm to the Plaintiff by not providing Midrin or an equivalent drug, such that harm the Plaintiff suffered was easily preventable.

On December 3, Dr. Myers expressed in his notes an understanding with the Plaintiff's frustration at being "caught in the middle of [a] custody-medical pissing match." The Plaintiff does not elaborate on the meaning of this statement or attempt to put it in context. The Court is not even sure which medications Dr. Myers is referencing in this statement. It is not reasonable to infer that the comment is a statement about the state of mind of the staff, except to the extent it expressed Dr. Myer's sympathy for the Plaintiff's position.

There is no evidence from which a reasonably jury could find that the medical staff was deliberately indifferent to the Plaintiff's medical needs on those instances when Midrin, or an equivalent drug, were not available at the prison.

2.      *Antibiotics*

In early November 2004, the Plaintiff waited several days to receive antibiotics that were already ordered and went without antibiotics for two days at the end of that same month. Then, in December he was "refused medication periodically because of some alleged confusion of the time of dispensing the medication" and he did not receive his full course of antibiotics. (Pl. Resp. DE 10 at 10.)

Even if the Plaintiff has presented evidence from which a jury could conclude that the medical staff knew that there was a substantial risk that the Plaintiff would develop infections by the sporadic use of antibiotics, the evidence does not support a finding that they had the requisite culpable state of mind. The evidence is that the staff made a mistake, not that they engaged in deliberate and malicious acts to deprive the Plaintiff of antibiotics. Bureaucratic mixups, scheduling problems, and plain negligence, all of which may describe the Plaintiff's trouble receiving antibiotics, do not arise to the level of the constitutional violation. While it is unfortunate that the nurses could not find Dr. Myers's orders, there is no evidence that they deliberately hid them or failed to look for them. The problem was rectified in two days. Nor is there any evidence that when the jail ran out of antibiotics, it was due to a recklessness attitude of the staff toward the Plaintiff and his medical needs. And while the medical staff may have been mistaken that the Plaintiff was required to take his first dose of antibiotics at 5:00 AM, the Plaintiff has not presented evidence that this was anything more than a mistake. In fact, even during this time, the Plaintiff continued to receive a daily antibiotic.

The Court recognizes that the Seventh Circuit has found that deliberate indifference can occur even for a single incident of refusal to provide antibiotic medication where the conduct

was deliberate and potentially malicious. *See Gil v. Reed*, 381 F.3d 649, 661–62 (7th Cir. 2004). In *Gil*, the court found that jury could infer that a physician assistant's refusal to hand out medication that was already prescribed, dispensed into bottle, labeled for the prisoner, and in the defendant's hands was malicious. *Id.* at 662. The defendant angrily refused to give the plaintiff his medication when he came through the medication line, threatened him with disciplinary action if he did not return immediately to his cell, and hung up the telephone when a guard called to find out what happened. *Id.* at 661.

The facts from *Gil* are distinguishable from the scenario presented by the designated evidence in this case. There is no evidence from which to infer malicious intent, particularly when the incidents are viewed in the totality of the care the Plaintiff received. *See Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) (stating that a court must examine the totality of an inmate's medical care when considering whether the care evidences deliberate indifference to serious medical needs). The detailed account of the care the Plaintiff received from July 2004 until the problems arose with his medication, and beyond, shows the occasional delays in receiving antibiotics to be "isolated instances of neglect, which taken alone or collectively cannot support a finding of deliberate indifference." *Gutierrez*, 111 F.3d at 1375 ("In view of this overall treatment record, revealing almost continuous care throughout much of this ten-month period, the isolated delays Gutierrez encountered simply cannot support a finding of deliberate indifference."). Neither can a "series of purely negligent acts be equated to deliberate indifference." *Sellers v. Henman*, 41 F.3d 1100, 1102–03 (7th Cir. 1994) (holding that while the presence of multiple acts of negligence is evidentiary, it is not an alternative theory of liability).

There is simply a lack of evidence pointing to a deliberately indifferent state of mind on

19

the part of the medical staff at MCF, and they are entitled to judgment as a matter of law.


**B.      Defendants Barr, Hobbs, Williams, Fry**

One troubling aspect of this case is the complete absence of any reference by the Plaintiff to Defendants Barr, Williams, and Fry. The Plaintiff uses Hobbs's name, but only once to say that he wrote Hobbs a letter in his capacity as Director of Nursing, asking for a meeting to discuss his problems with the medical staff. Defendant Stevenson responded to that letter.

To find a defendant liable, the Plaintiff must prove that he "personally participated in or caused" the unconstitutional delay in medical treatment. *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003). Even if the delay the Plaintiff experienced in receiving medication was actionable under the Eighth Amendment, the Plaintiff has not tendered evidence that these Defendants were personally responsible for this delay. There is no indication of the specific action any one of these Defendants took in relation to the Plaintiff's medication or otherwise and thus, no genuine issue of material fact whether they knew of a substantial risk of serious harm and consciously disregarded it.

For example, the Plaintiff complains that, on October 12, 2004, he notified his dorm officer that his left ear was leaking and that Dr. Myers wanted to see him, but that the nursing staff told the Plaintiff he had to complete a health care slip. The Plaintiff does not indicate which, if any, of the Defendants were on the nursing staff on this date. (Nor does he explain the reason it was unreasonable for the nursing staff to require him to complete a health care slip. In any event, he had an appointment at Wishard the next day.) The Plaintiff also complains that nurses refused him treatment on December 4, and 5, 2004, but he does not describe the nature of

20

the treatment that he was denied or who denied it. The Plaintiff contends that, on another

occasion, the nursing staff told Officer Tuley not to allow the Plaintiff into the hospital. He does

not attempt to identify the person who gave Officer Tuley that command. In another example,

the Plaintiff states that the night nurse called the prison dorm to order that the Plaintiff not be

released to the medical facility, but he does not identify the night nurse.

Without any indication as to what each Defendant did, none of the designated facts

establish a "causal connection, or affirmative link" between the deprivation and the Defendants'

conduct. *See Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) (describing the necessary

link for individual liability under § 1983). Perhaps the Plaintiff believed that the Court would

read the evidentiary materials that he submitted and find the names of the individual Defendants.

But it is not enough for the Plaintiff to submit deposition testimony and exhibits and hope that

the Court will read it in its entirety. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562

(7th Cir. 1996) ("It is not our function to scour the record in search of evidence to defeat a

motion for summary judgment; we rely on the nonmoving party to identify with reasonable

particularity the evidence upon which he relies."). Northern District of Indiana Local Rule 56.1

requires that the Plaintiff set forth all material facts that he contends exist and must be litigated,

supported by specific citations to the record.

Because Defendant Barr addresses his lack of personal involvement in a separate reply

brief, the Court will address his purported role in more detail. Defendant Barr, like Defendants

Williams and Fry, is not mentioned in the Plaintiff's Statement of Genuine Issues. However,

Defendant Barr digs into the evidentiary material to defend the claim against him. He notes in

his reply brief that even the designated page of the Plaintiff's deposition provides only that

Defendant Barr may have commented, "Well, mistakes happen" and told the Plaintiff to return to the doctor's office. (Pl. Dep. at 108–09.) The deposition indicates that the comment was in response to a doctor's confrontation with Barr about the Plaintiff being marked as having taken medication that had not even arrived at the facility yet. (*Id.* at 108.) This statement is the only act that the Plaintiff identifies from Defendant Barr. Indeed, the Plaintiff acknowledges that he did not see or hear Defendant Barr personally participate in any of the other events of which he complains. (*Id.* at 109.) This is not the kind of evidence from which a reasonable jury could conclude that Defendant Barr was deliberately indifferent to the Plaintiff's serious medical needs.

Defendants Barr, Hobbs, Williams, and Fry, are entitled to summary judgment for the reason that, without any evidence regarding what actions these particular Defendants took with regard to the Plaintiff's medical treatment, there is not "sufficient evidence favoring the nonmoving part for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

### C.    Defendant Tuley

Defendant Tuley did not allow the Plaintiff into the Offender Services Building on three or four occasions. Once, she was following the orders of the nursing staff, who told her not to let the Plaintiff into the building. Another time, the medical staff was not seeing any inmates. On two occasion, Officer Prater escorted the Plaintiff into the building anyway.[6]

Tuley does not schedule appointments for MCF medical staff. Tuley cannot be

---

[6] It is not clear from the Plaintiff's deposition whether the Plaintiff was admitted into the building despite Officer Tuley's refusal because he was escorted by another officer, or whether he was required to remain outside while the officer saw Dr. Myers.

considered to have acted with deliberate indifference to the Plaintiff's medical needs when she did not allow him access on the occasions when no doctors were available. Moreover, Tuley, as a non-medical prison official, could rely on the instructions of the medical staff who had been treating the Plaintiff . *See Johnson v. Doughty*, 433 F.3d 1001, 1012 (7th Cir. 2006) (stating that non-medical prison official cannot be held "deliberately indifferent simply because he failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor") (brackets omitted).

In addition, the Plaintiff has not presented evidence of the harm that he suffered by the delay in seeing a doctor on those specific dates. Dr. Myers had already ordered antibiotics for the Plaintiff. In two of the instances, the Plaintiff was escorted to the medical facility despite Tuley's actions. There is not sufficient evidence against Tuley to present the case to a jury, and she is entitled to judgment as a matter of law.

**D.      Defendant Stevenson**

Defendant Stevenson is the Assistant Superintendent of Programs. Because the Plaintiff has not filed a response to Defendant Stevenson's motion for summary judgment, it is difficult to discern what the Plaintiff believes she did to violate his Eighth Amendment rights. The Defendant acknowledged in his deposition that he did not have any proof that Stevenson refused to approve a referral, told someone else not to do something, or otherwise actively did anything to block the Plaintiff's treatment for an ear infection. (Pl. Dep. at 82.) Stevenson does not have any input in the process of referring inmates to outside hospitals or scheduling appointments for outside referrals. Neither is she involved in scheduling appointment for MCF medical staff.

There is no evidence that she was involved with, directed, or consented to the procedures regarding the distribution of the Plaintiff's medication.

> The doctrine of *respondeat superior* can not be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights. Supervisory liability will be found, however, if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it. That is, to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct. Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. . . . The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.

*Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (citations, quotation marks, and brackets omitted) (ellipsis in original). There is no genuine issue of material fact on the issue of whether Defendant Stevenson acted knowingly or with deliberate, reckless indifference to the Plaintiff's serious medical needs.

## CONCLUSION

For the foregoing reasons, the Motions for Summary Judgment filed by Defendants Barr, Hobbs, Williams, Fry (DE 46), Officer Tuley, and Stevenson (DE 59) are GRANTED. The Plaintiff is granted until March 28 to offer proof of service on Defendant Dr. Eke Kalu or to submit a brief showing good cause for his failure to serve him within 120 days after filing the Complaint. *See* Fed. R. Civ. P. 4(m). If no response is received from the Plaintiff by March 28, the Court will dismiss the action against Dr. Kalu without prejudice, and final judgment will be entered in this case.

SO ORDERED on February 25, 2008.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION